BLAINE v. THOMAS et al.

(Supreme Court, Appellate Division, First Department.   April 7, 1905.)

STOCKBROKERS—UNLAWFUL SALE OF STOCK—FINDINGS—EVIDENCE.

> In an action to recover damages against defendants, as stockbrokers, for an alleged unlawful sale of certain stock carried for plaintiff on margin, evidence *held* to sustain findings that the stock was purchased for plaintiff's individual account, and was sold in violation of defendants' agreement that plaintiff should have the entire day on which the stock was sold in which either to put up margin called for, or arrange to otherwise take care of the shares.

Appeal from Trial Term, New York County.

Action by James G. Blaine against Edward R. Thomas and others. From a judgment in favor of plaintiff, defendants appeal. Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

E. D. Hawkins, for appellants
S. Harris, for respondent.

PATTERSON, J.   The plaintiff was a customer of the defendants, who were stockbrokers in the city of New York.   He sued to recover damages for an alleged unauthorized sale of a thousand shares of Pennsylvania Railroad stock, which they were carrying for him on margin.   At the trial he had a verdict, and from the judgment entered thereon, and from an order denying a motion for a new trial, the defendants appeal.

The plaintiff claimed that between April 2 and June 15, 1901, the defendants purchased for his account certain stocks, and among them the Pennsylvania stock, and that he had on deposit with them a cash margin; that on May 9, 1901, the defendants sold the stock, without notice to him and without his consent, at $139 a share; that on the same day he sold 1,000 shares of Pennsylvania stock for $142 a share through other brokers in the city of New York; that on the following day he requested such other brokers to call upon the defendants for the 1,000 shares, which was done, but the defendants refused to deliver the same; that, to replace the stock, he was required to pay $144 a share; and he claims as damages the difference between $139 and what he paid to replace the shares. In the answer the defendants set up that the 1,000 shares of stock were not bought for the plaintiff individually, but for him and one George T. Blackstock jointly (and in this connection it is claimed that there is a defect of parties, Blackstock not being made a party); that the sale of the 1,000 shares on May 9th was made after due demand and notice, and for the joint account of the plaintiff and Blackstock, and before the defendants were informed that the plaintiff had sold the stock through other brokers, or intended to do so. It was agreed on the trial that, if the plaintiff were entitled to recover at all, the measure of damages would be the amount claimed in the complaint, with interest to the date of trial.   There are two issues of fact, and they are very concisely and satisfactorily for-

mulated by counsel for the appellants as follows: First. Was the account a joint account of Blaine and Blackstock, or the individual account of the plaintiff, James G. Blaine? Second. Were the relations between the plaintiff, as customer, and the defendants, as his stockbrokers, such on May 9, 1901, that defendants were justified in selling the 1,000 shares of Pennsylvania stock?

Concerning the first question it is undoubtedly true that, at the beginning of transactions in stocks between the plaintiff and the defendants, an account was opened on the defendants' books in the names of Blaine and Blackstock jointly. The transactions began with the purchase of 200 shares of Bank of Commerce stock. The plaintiff deposited $15,000 in cash as margin. When that account was opened, Blackstock was jointly interested with the plaintiff in any profits that might accrue upon the purchase of the bank stock, and it appears that Blackstock had no other interest in that stock. Blackstock himself so testifies, and in that respect corroborates the plaintiff. On the 29th of April, 1901, the plaintiff gave to the defendants an order to buy the Pennsylvania stock for himself, personally, as he says, at 153. There was ample margin for that stock. Blackstock had no interest in that purchase. The defendants entered it in the account kept in the names of Blaine and Blackstock, but there can be no doubt whatever, on the evidence, that the 1,000 shares of Pennsylvania stock belonged solely to Blaine. It is not shown that Blackstock had any communication whatever with the defendants with respect to the purchase of this stock. It was put in the account of Blaine and Blackstock without the request or consent of Blaine, although money in the first account was used "to margin" the purchase. When the $15,000 was deposited by Blaine, a receipt was given him by the defendants in his individual name. It seems that $12,000 was sufficient as margin for the Bank of Commerce stock, and that left $3,000 of Blaine's money available to him for further transactions. On the other hand, it would appear that notice of the purchase of the Pennsylvania stock was given by the defendants as on account of Blaine and Blackstock, and no notification was given by Blaine that that was incorrect, and it may be said that there are other circumstances in the case aiding the version of the defendants as to the nature of this transaction. However, on the conflicting testimony, the jury, on the submission of the question as one specially put to them, found in favor of the plaintiff, and, on all the conflicting testimony, we see no reason for interfering with their verdict.

Concerning the unlawful sale or conversion of the Pennsylvania shares by the defendants, the jury found in favor of the plaintiff. It is not necessary to comment upon the general duty of a stockbroker carrying stock on margin for a customer to make a demand for further margin, or, in default thereof, to give notice of the time and place of sale. The cause was tried on this branch of the case upon the theory that the defendants violated an agreement they had made with the plaintiff with respect to furnishing margin or otherwise taking care of the Pennsylvania stock. The following facts appear in evidence: On May 8th, while the defendants were

still carrying the stock, the market became disturbed, and on the 9th that condition developed into one of wild panic. On the 8th the plaintiff was in Washington, and he was called up on the long distance telephone by a Mr. Stebbins, who seems to have been a manager of the defendants' business. That gentleman called for $6,000 margin on the Pennsylvania stock. The plaintiff swears that he replied that his account stood impaired only for about $500, and it was unnecessary to call upon him for such margin. The plaintiff also swears that Mr. Stebbins, when he asked for margin, demanded that the plaintiff should put it up "or lighten that load." On the next morning, the 9th, the plaintiff was called up again on the long distance telephone; and he swears that he was required either to liquidate the transaction, or take it out of the defendants' office and transfer it to some other office. Mr. Thomas, one of the defendants, then talked with the plaintiff over the telephone, and the plaintiff says Mr. Thomas demanded the amount of the margin, or that the load be lightened, and that the plaintiff then said that he would either put up the margin or take care of the Pennsylvania stock during the day, before the close of business. The Wall street day closes at 3 o'clock. Mr. Thomas is understood as testifying that no such conversation took place. He admits that he had a conversation over the telephone with reference to the matter on May 9th, and that he talked with Mr. Blaine at about half past 11 o'clock in the morning of that day. He also swears that he told the plaintiff "that, unless he could either protect his account or send us $5,000 at once, that I would have to sell part of his account." To which the plaintiff responded: "Don't bother me about this case. I have got other and more important affairs to attend to, and I will try to attend to it later." Mr. Thomas states that he also said that that would not do, because there was a terrible panic, and that he could not tell how much lower prices were going, and that unless the plaintiff could send $5,000 at once, or take up part of his account, he should have to sell him out immediately; and he declares that that was the end of the conversation. On his cross-examination, Mr. Thomas swears that it was about a quarter to 12 o'clock when he talked to Blaine, and that within 20 minutes or half an hour after that the Pennsylvania stock was sold out. Blaine testifies that, immediately after this conversation over the telephone with Mr. Thomas, he gave an order to sell 1,000 shares of the stock, and a special direction was sent to New York immediately to bankers to go to the defendants and take up the shares held by them, and on the same afternoon, as soon as he could get the use of the long distance telephone, he duly notified the defendants; thus seeking to establish that he carried out his agreement to take care of the Pennsylvania shares during the business day of the 9th of May.

The court submitted to the jury this special question:

"Did the defendants agree on May 9th with the plaintiff that the latter could have that entire day within which either to pay $5,000 additional margin, or to otherwise take care of the stock?"

Some criticism is made upon the amount of $5,000 mentioned in this question as the margin required, but that was undoubtedly

stated because of the testimony of the defendant Thomas that he told Blaine either to protect his account, or send $5,000 at once. The jury, on the irreconcilable conflict in the statements of the two parties, found that the agreement was made as claimed by the plaintiff.

The jury were justified in believing that the defendants assented to the plaintiff having the whole day in which either to put up margin, or arrange for taking care of the shares; but the defendants sold the plaintiff out before 1 o'clock, and thus violated the agreement which they had made. Such being the case, we are not authorized to disturb the verdict of the jury. The exceptions are not of such importance as to require a reversal of the judgment, and, as it has been agreed between the parties what the measure of damages should be, if any were allowed, no consideration of that subject is necessary.

The judgment and order appealed from should be affirmed, with costs. All concur.